**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

CHRISTINE GEORGE,                    ) Case No. EDCV 16-0757-JPR
                                     )
                    Plaintiff,       )
                                     ) **MEMORANDUM DECISION AND ORDER**
          v.                         ) **AFFIRMING COMMISSIONER**
                                     )
NANCY A. BERRYHILL, Acting           )
Commissioner of Social               )
Security,                            )
                                     )
                    Defendant.       )
_____      )

**I.    PROCEEDINGS**

        Plaintiff seeks review of the Commissioner's final decision
denying her application for supplemental security income benefits
("SSI").  The parties consented to the jurisdiction of the
undersigned U.S. Magistrate Judge under 28 U.S.C. § 636(c).  The
matter is before the Court on the parties' Joint Stipulation,
filed January 12, 2017, which the Court has taken under
submission without oral argument.  For the reasons stated below,
the Commissioner's decision is affirmed.

## II. BACKGROUND

Plaintiff was born in 1970.  (Administrative Record ("AR") 205, 218.)  She completed third grade (AR 45) and worked as a self-employed door-to-door salesperson (AR 46).

On January 30, 2012, Plaintiff protectively filed an application for SSI, alleging that she had been unable to work since March 13, 2011 (AR 219), because of depression, arthritis of the spine, mood swings, "left tendonitis," diabetes, manic episodes, and stress (AR 62).  After her application was denied initially and on reconsideration, she requested a hearing before an Administrative Law Judge.  (AR 98, 104, 109.)  A hearing was held on August 20, 2014, at which Plaintiff, who was represented by counsel, testified, as did a vocational expert.  (See AR 42-61.)  In a written decision issued September 15, 2014, the ALJ found Plaintiff not disabled.  (AR 19-36.)  Plaintiff sought Appeals Council review (AR 18, 296-97), which was denied on February 25, 2016 (AR 1-4).  This action followed.

## III. STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole.  See id.; Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion.  Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  It is more than a scintilla but less than a preponderance.

1  <u>Lingenfelter</u>, 504 F.3d at 1035 (citing <u>Robbins v. Soc. Sec.</u>

2  <u>Admin.</u>, 466 F.3d 880, 882 (9th Cir. 2006)).  To determine whether

3  substantial evidence supports a finding, the reviewing court

4  "must review the administrative record as a whole, weighing both

5  the evidence that supports and the evidence that detracts from

6  the Commissioner's conclusion."  <u>Reddick v. Chater</u>, 157 F.3d 715,

7  720 (9th Cir. 1996).  "If the evidence can reasonably support

8  either affirming or reversing," the reviewing court "may not

9  substitute its judgment" for the Commissioner's.  <u>Id.</u> at 720-21.

10  **IV.  THE EVALUATION OF DISABILITY**

11      People are "disabled" for purposes of receiving Social

12  Security benefits if they are unable to engage in any substantial

13  gainful activity owing to a physical or mental impairment that is

14  expected to result in death or has lasted, or is expected to

15  last, for a continuous period of at least 12 months.  42 U.S.C.

16  § 423(d)(1)(A); <u>Drouin v. Sullivan</u>, 966 F.2d 1255, 1257 (9th Cir.

17  1992).

18      A.   <u>The Five-Step Evaluation Process</u>

19      The ALJ follows a five-step sequential evaluation process to

20  assess whether a claimant is disabled.  20 C.F.R.

21  § 416.920(a)(4); <u>Lester v. Chater</u>, 81 F.3d 821, 828 n.5 (9th Cir.

22  1995) (as amended Apr. 9, 1996).  In the first step, the

23  Commissioner must determine whether the claimant is currently

24  engaged in substantial gainful activity; if so, the claimant is

25  not disabled and the claim must be denied.  § 416.920(a)(4)(i).

26      If the claimant is not engaged in substantial gainful

27  activity, the second step requires the Commissioner to determine

28  whether the claimant has a "severe" impairment or combination of

3

impairments significantly limiting her ability to do basic work activities; if not, the claimant is not disabled and her claim must be denied. § 416.920(a)(4)(ii).

If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments set forth at 20 C.F.R. part 404, subpart P, appendix 1; if so, disability is conclusively presumed. § 416.920(a)(4)(iii).

If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[1] to perform her past work; if so, she is not disabled and the claim must be denied. § 416.920(a)(4)(iv). The claimant has the burden of proving she is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets that burden, a prima facie case of disability is established. Id.

If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because she can perform other substantial gainful work available in the national economy. § 416.920(a)(4)(v); Drouin, 966 F.2d at 1257. That determination comprises the fifth and final step in the sequential analysis. § 416.920(a)(4)(v); Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d

---

[1] RFC is what a claimant can do despite existing exertional and nonexertional limitations. § 416.945; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

4

at 1257.

B.   <u>The ALJ's Application of the Five-Step Process</u>

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 30, 2012, the application date.  (AR 24.)  At step two, he concluded that Plaintiff had severe impairments of morbid obesity, degenerative joint disease, deep vein thrombosis, and "mood disorder not otherwise specified."  (<u>Id.</u>)  At step three, he determined that Plaintiff's impairments did not meet or equal a listing.  (AR 24-26.)

At step four, the ALJ found that Plaintiff had the RFC to perform sedentary work with the following limitations:

> [She] can lift ten pounds or less frequently, up to ten
> pounds occasionally; [she] can stand, walk or sit for six
> hours out of an eight-hour workday; [she] can push and/or
> pull within the weight limits indicated above; [she] can
> occasionally climb ramps and stairs, balance, stoop,
> kneel, crouch or crawl; [she] cannot climb ladders, ropes
> or scaffolds; [she] must avoid concentrated exposure to
> heat; [she] must avoid unprotected machinery and heights;
> [and she] is limited to simple tasks in a nonpublic work
> setting.

(AR 26.)  The ALJ determined that Plaintiff had no past relevant work.  (AR 34.)  At step five, he relied on the VE's testimony to find that given Plaintiff's age, education, work experience, and RFC for "unskilled sedentary" work "impeded by additional limitations," she could perform two sedentary, unskilled "representative occupations" in the national economy:

"assembler,"[2] DOT 739.687-066, 1991 WL 680189, and (2) "table

worker," DOT 739.687-182, 1991 WL 680217. (AR 34-35.) The ALJ

determined that the VE's testimony was consistent with the DOT.

(AR 35.) Accordingly, he found Plaintiff not disabled. (Id.)

**V. DISCUSSION**

Plaintiff argues that the ALJ erred in (1) assessing her

RFC, (2) assessing the opinion of her treating psychiatrist, Dr.

Daniel Padua, and (3) finding that she could perform the

identified unskilled sedentary jobs.[3] (See J. Stip. at 4-5.)[4]

    A. <u>The ALJ Did Not Err in Assessing Plaintiff's RFC, and</u>

       <u>Any Error Was Harmless</u>

Plaintiff contends that the ALJ erred in failing to include

in her RFC a "limitation to one- to two-step tasks." (Id. at 6-

7.) For the reasons discussed below, remand is not warranted on

this basis.

    1. <u>Applicable law</u>

A claimant's RFC is "the most [she] can still do" despite

the impairments and related symptoms that "may cause physical and

mental limitations that affect what [she] can do in a work

setting." § 416.945(a)(1). A district court must uphold an

---

[2] The full title of the occupation as listed in the Dictionary of Occupational Titles is "compact assembler." <u>See</u> DOT 739.687-066, 1991 WL 680189.

[3] Plaintiff's issue two, that the ALJ erred in not including "the presence of a marginal education" in his hypothetical to the VE, and issue three, that the ALJ erred in relying on the VE's testimony in finding that she met the educational requirements of the identified occupations, are discussed together.

[4] The Court discusses the issues in a different order from the parties.

ALJ's RFC assessment when the ALJ has applied the proper legal standard and substantial evidence in the record as a whole supports the decision. <u>Bayliss v. Barnhart</u>, 427 F.3d 1211, 1217 (9th Cir. 2005). The ALJ must consider all the medical evidence in the record together with "the rest of the relevant evidence." § 416.927(b); <u>see also</u> § 416.945(a)(1) ("We will assess your residual functional capacity based on all the relevant evidence in your case record."). In determining the RFC, the ALJ may consider those limitations for which there is support in the record and need not consider properly rejected evidence or subjective complaints. <u>See</u> <u>Bayliss</u>, 427 F.3d at 1217 (upholding ALJ's RFC determination because "the ALJ took into account those limitations for which there was record support that did not depend on [claimant's] subjective complaints"); <u>Batson v. Comm'r of Soc. Sec. Admin.</u>, 359 F.3d 1190, 1197 (9th Cir. 2004) (ALJ not required to incorporate into RFC those findings from treating-physician opinions that were "permissibly discounted"). The ALJ is not bound by findings by state-agency medical consultants and experts but must consider such findings and opinions as "opinion evidence." § 416.927(e)(2). Medical-source opinions on ultimate issues reserved to the Commissioner, such as a claimant's RFC or the application of vocational factors, are not medical opinions and have no special significance. § 416.927(d). The Court must consider the ALJ's decision in the context of "the entire record as a whole," and if the "'evidence is susceptible to more than one rational interpretation,' the ALJ's decision should be upheld." <u>Ryan v. Comm'r of Soc. Sec.</u>, 528 F.3d 1194, 1198 (9th Cir. 2008) (citation omitted).

The DOT describes six levels of reasoning under the "Reasoning Development" scale. <u>See</u> DOT, app. C, 1991 WL 688702. Level-one reasoning is "the lowest rung on the development scale," requiring "only the slightest bit of rote reasoning." <u>Meissl v. Barnhart</u>, 403 F. Supp. 2d 981, 984 (C.D. Cal. 2005). Although level-two reasoning requires the ability to follow "detailed but uninvolved written or oral instructions," it "specifically caveats that the instructions would be uninvolved — that is, not a high level of reasoning." <u>Flaherty v. Halter</u>, 182 F. Supp. 2d 824, 850 (D. Minn. 2001). Thus, level-two reasoning is not inconsistent with a limitation to "simple, repetitive instructions." <u>Miessl</u>, 403 F. Supp. 2d at 984-85 (claimant able to perform "simple, repetitive instructions" has level-two reasoning skills); <u>see also Grigsby v. Astrue</u>, No. EDCV 08-1413 AJW, 2010 WL 309013, at *2 (C.D. Cal. Jan. 22, 2010) ("The restriction to jobs involving no more than two-step instructions is what distinguishes Level 1 reasoning from Level 2 reasoning."). A restriction to only one- or two-step tasks is likely inconsistent with level-two reasoning. <u>See Rounds v. Comm'r Soc. Sec. Admin.</u>, 807 F.3d 996, 1004 (9th Cir. 2015) (as amended) (holding that claimant's RFC limitation to "one- and two-step tasks" appeared to conflict with level-two reasoning as generally described in the DOT).

2. <u>Relevant background</u>

a. *Dr. Rathana-Nakintara*

On August 29, 2012, state-agency consulting psychiatrist Dr. Thaworn Rathana-Nakintara completed a psychiatric evaluation. (AR 1135-39.) In a mental-status examination, Plaintiff was able

8

to do "serial sevens subtraction" as well as "serial threes" and could spell words forward and backward. (AR 1137.) Dr. Rathana-Nakintara diagnosed Plaintiff with mood disorder and assigned her a global assessment of functioning ("GAF") score of 70.[5] Under the "Medical Source Statement" section, Dr. Rathana-Nakintara found that Plaintiff had no functional limitations whatsoever, including no limitations in her ability to perform simple and repetitive or detailed and complex tasks or do "work activities on a consistent basis without special or additional supervision." (AR 1138-39.) Dr. Rathana-Nakintara found that Plaintiff would "be able to handle the usual stresses, changes and demands of gainful employment," was "adhering and responding well to treatment," and had a "good" prognosis. (AR 1139.)

        b.   *Dr. Hurwitz*

On September 12, 2012, state-agency consultant Dr. H.N. Hurwitz[6] completed the mental-health portion of Plaintiff's disability determination on initial review. (AR 67-78.) In the "Findings of Fact and Analysis of Evidence," the disability

---

[5] GAF scores assess a person's overall psychological functioning on a scale of 1 to 100. See Diagnostic and Statistical Manual of Mental Disorders 32 (revised 4th ed. 2000). A GAF score of 61 to 70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV 34. GAF scores have been excluded from the latest edition of DSM because of concerns about their reliability and lack of clarity, however. See DSM-V 15-16 (5th ed. 2013).

[6] Dr. Hurwitz has a specialty code of "37" (AR 79), indicating "[p]sychiatry," see Program Operations Manual System (POMS) DI 24501.004, U.S. Soc. Sec. Admin. (May 5, 2015), http://policy.ssa.gov/poms.nsf/lnx/0424501004.

examiner noted that Plaintiff appeared "capable of work at a non-public unskilled level" and of "understanding, remembering and carrying out simple one to two step tasks (unskilled tasks)." (AR 67-70.)  Plaintiff was also "able to maintain concentration, persistence and pace throughout a normal workday/workweek as related to unskilled tasks" and "interact adequately with coworkers and supervisors," but she "may have difficulty dealing with the demands of general public contact."  (Id.)  In a subsequent note, apparently to Dr. Hurwitz and written after Dr. Rathana-Nakintara's exam, the disability examiner states,

> Though [the consultative examiner] found [Plaintiff] to
> have no limitations, based on evidence as a whole, I
> still believe that [Plaintiff] is capable of unskilled
> work in a non-public setting.  Please review & advise.

(Id.)  Dr. Hurwitz confirmed by affixing his electronic signature under the note, with the notation, "Reviewed/Agreed."

Dr. Hurwitz completed a psychiatric review and determined that Plaintiff had mild restriction in her activities of daily living and moderate difficulty maintaining social functioning and concentration, persistence, or pace.  (AR 71-72.)  For Plaintiff's mental RFC, Dr. Hurwitz noted that Plaintiff had no significant limitations in her ability to understand, remember, and carry out very short and simple instructions, but she was moderately limited in her ability to do the same as to detailed instructions.  (AR 75.)  She was not significantly limited in her ability to complete a normal workday and week "without interruptions from psychologically based symptoms."  (AR 76.) She was moderately limited in her ability to interact

appropriately with the general public. (_Id._) When asked to "explain in narrative form" those limitations, Dr. Hurwitz wrote, "see FOFAE," apparently referring to the "Findings of Fact and Analysis of Evidence" section of the form. (AR 75-76.) At the end, the form asks for "three occupations" Plaintiff could perform. (AR 77.) One of the three jobs listed in response was "Lens-Block Gauger," DOT 716.687-030, 1991 WL 679466, which requires level-two reasoning. (AR 77.) The other two listed jobs require level-one reasoning. (_See id._ (citing "Table Worker," DOT 739.687-182, 1991 WL 680217, and "Cleaner, Housekeeping," DOT 323.687-014, 1991 WL 672783).)

c. _Dr. Loomis_

On May 28, 2013, state-agency consultant Dr. K.J. Loomis completed the mental-health portion of Plaintiff's case analysis on reconsideration. (AR 80-96.) In the "Findings of Fact and Analysis of Evidence" section, another agency disability examiner noted that the "initial decision . . . finds [Plaintiff] capable of unskilled and non-public, light work." (AR 87.) After summarizing the new evidence, the examiner asked Dr. Loomis to "advise" on a mental-RFC for "unskilled, non-public work." (AR 88.) Dr. Loomis wrote,

> Reviewed. Agree with above. No objective data compromising prior decision as written. Adopt prior decision as written.

(_Id._) The mental RFC portion of the form, signed by Dr. Loomis, is identical to that of Dr. Hurwitz (_compare_ AR 75-76, _with_ AR 93-94) except that Dr. Loomis added the "additional explanation" that Plaintiff was "capable of performing 1-2 step tasks in a

non-public setting" (AR 94).  At the end of the form, where it
asks for three representative jobs that Plaintiff could perform,
"Lens-Block Gauger" is listed, as is "Addresser," DOT 209.587-
010, 1991 WL 671797, both jobs that require level-two reasoning.
(AR 95.)  A third job, "Table Worker," DOT 739.687-182, 1991 WL
680217, is listed, which is a level-one-reasoning job that was
also listed on Dr. Hurwitz's initial review.  (<u>Id.</u>)

       3.  <u>Analysis</u>

     Plaintiff argues that the ALJ erred in rejecting without
explanation a limitation to one- or two-step tasks allegedly
assessed by state-agency doctors Hurwitz and Loomis.  (J. Stip.
at 6-7.)

     The ALJ limited Plaintiff to "simple tasks."  (AR 26.)  In
assessing Plaintiff's mental impairments, he gave "great weight"
to the opinions of state-agency consultants Drs. Loomis and
Hurwitz.  (AR 32-33.)  He did not, however, adopt their opinions
in full.  (<u>See</u> <u>id.</u>)  The ALJ summarized their opinions, noting
that they had "opined [that Plaintiff] had moderate limitation
with regard to the ability to understand, remember and carry out
detailed instructions, interact appropriately with the public and
accept instructions and respond appropriately to criticism."
(<u>Id.</u>)  The ALJ found that their opinions were "consistent with
[Plaintiff's] medical records as a whole, which reveal reports of
decreased symptoms with medication and mental status examinations
which revealed normal tone and clarity of speech and a goal
directed thought process."  (AR 33.)

     The ALJ gave "some weight" to Dr. Rathana-Nakintara's
opinion that Plaintiff had no relevant functional limitations and

would be able to "handle the usual stresses, changes and demands of gainful employment." (AR 1139.) In giving Dr. Rathana-Nakintara's opinion some weight, the ALJ noted that he had "generously considered [Plaintiff's] subjective complaints of difficulty being around other people, difficulty with concentration and mood swings" and thus "included limitations of simple tasks in a nonpublic work setting" as part of Plaintiff's RFC "to account for [Plaintiff's] subjective complaints." (AR 33.) In limiting Plaintiff to "simple tasks in a nonpublic work setting," the ALJ noted that her RFC was "consistent with the evidence as a whole." (Id.) The ALJ gave "little weight" to Dr. Padua's opinion. (Id.) As discussed in more detail in Section V.B., the ALJ gave specific and legitimate reasons for doing so.

As an initial matter, Dr. Hurwitz and Dr. Loomis may not have limited Plaintiff to one- or two-step tasks. Dr. Hurwitz did not himself complete the "Findings of Fact and Analysis of Evidence" portion of the case analysis on initial review; he "Reviewed/Agreed" with it. (AR 17.) And although part of that section noted that Plaintiff was "capable of understanding, remembering and carrying out simple one to two step tasks (unskilled tasks)," later in that section, in what appears to be a direct question to Dr. Hurwitz, it states,

I still believe that [Plaintiff] is capable of unskilled

work in a non-public setting. Please review & advise.
(AR 70.) Dr. Hurwitz "agreed" with that assessment, which included no limitation to one- or two-step tasks. (Id.) A reasonable interpretation of Dr. Hurwitz's opinion is that he agreed with the assessment that Plaintiff was "capable of

13

unskilled work in a non-public setting."

Even if Dr. Hurwitz implicitly adopted the earlier assessment that Plaintiff was "capable of . . . one to two step (unskilled tasks)," that does not translate into a limitation to one- to two-step tasks. A capability of doing one- or two-step tasks is different from a limitation to only those tasks. See Etter v. Astrue, No. CV 10-582-OP, 2010 WL 4314415, at *5 (C.D. Cal. Oct. 22, 2010). This is especially so because Dr. Hurwitz's other findings do not support a limitation to one- or two-step tasks. He found that Plaintiff had no significant limitation in understanding, remembering, and carrying out "very short and simple instructions." (AR 75.) And one of the three occupations Plaintiff could perform based on Dr. Hurwitz's RFC requires level-two reasoning, which is generally inconsistent with a limitation to only one- or two-step tasks. See Rounds, 807 F.3d at 1004. Dr. Loomis agreed with the "Findings of Fact and Analysis of Evidence" and "[a]dopt[ed] the prior decision as written." (AR 88.) Dr. Loomis was asked to "advise" on a mental-RFC for "unskilled, non-public work," with which he agreed. (Id.) Dr. Loomis summarized Dr. Hurwitz's opinion as finding that Plaintiff was "capable of unskilled and non-public" work." (AR 87.) At the end of his assessment of Plaintiff's RFC, which was identical to that of Dr. Hurwitz, he noted that Plaintiff was "capable of performing 1-2 step tasks in a non-public setting." (AR 94.) Again, Dr. Loomis did not opine that Plaintiff was limited to tasks involving only one or two steps. Indeed, Dr. Loomis specifically opined that Plaintiff would be able to perform two representative occupations requiring level-

two reasoning.  (AR 95.)  Plaintiff thus misconstrues Dr.

Loomis's notation as to her ability to follow one- and two-step

instructions as limiting her to only such tasks.  See Etter, No.

CV 10-582-OP, 2010 WL 4314415, at *5.

Even assuming the ALJ erred in failing to limit Plaintiff to

one- or two-step tasks, any error was harmless.  The VE testified

that a person with Plaintiff's RFC could perform two

representative occupations: compact assembler, DOT 739.687-066,

1991 WL 680189, and table worker, DOT 739.687-182, 1991 WL

680217.  (AR 59.)  A compact assembler must possess "level 2

reasoning," which is described as the ability to "[a]pply

commonsense understanding to carry out detailed but uninvolved

written or oral instructions" and "[d]eal with problems involving

a few concrete variables in or from standardized situations."

DOT 739.687-066, 1991 WL 680189.  The table-worker job requires

"level 1 reasoning," which is the ability to "[a]pply commonsense

understanding to carry out simple one- or two-step instructions"

and "[d]eal with standardized situations with occasional or no

variables in or from these situations encountered on the job."

DOT 739.687-182, 1991 WL 680217.

Even if the level-two-reasoning requirements of the compact-

assembler job are inconsistent with a limitation to one- or two-

step tasks, see Rounds, 807 F.3d at 1004, any error was harmless

because Plaintiff was capable of performing the table-worker job,

which requires only level-one reasoning and has 187,000 jobs

available nationally.[7]  See Stout v. Comm'r, Soc. Sec. Admin.,

---

[7] Plaintiff wonders whether "a reasonable person would
accept the proposition that a table worker represents 187,000

15

454 F.3d 1050, 1055 (9th Cir. 2006) (nonprejudicial or irrelevant mistakes are harmless); Gallo v. Comm'r of Soc. Sec. Admin., 449 F. App'x 648, 650 (9th Cir. 2011) ("Because the ALJ satisfied his burden at Step 5 by relying on the VE's testimony about the Addresser job, any error that the ALJ may have committed by relying on the testimony about the 'credit checker' job was harmless" (citing Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1162 (9th Cir. 2008)); see also Tommasetti v. Astrue, 533 F.3d 1035, 1043-44 (9th Cir. 2008) (holding that VE's testimony describing single occupation for which significant number of jobs existed sufficed); Tamayo v. Colvin, No. CV 12-8484 JCG, 2013 WL 5651420, at *2 (C.D. Cal. Oct. 11, 2013) (finding one occupation sufficient "as long as [it] still has a significant number of positions that exist in the national economy" (citation omitted)). Some 187,000 jobs available nationally is a significant number. See Gutierrez v. Comm'r of Soc. Sec., 740 F.3d 519, 528-29 (9th Cir. 2014) (holding that 25,000 nationally available jobs presented a "close call" but nonetheless sufficed as "work which exists in significant numbers").

Indeed, Plaintiff appears to concede that Plaintiff could perform the table-worker job, arguing instead that the ALJ "never found the single occupation of a table worker to constitute a significant number of jobs or whether the elimination of half the identified vocational base would constitute a significant erosion." (J. Stip. at 7.) Plaintiff's argument is without

_____

jobs in the national economy." (J. Stip. at 12.) But the VE so testified, and Plaintiff has offered no evidence to the contrary.

merit.  First, the ALJ expressly noted that the VE testified that
187,000 table-worker jobs existed nationally and adopted that
testimony as his own.  (See AR 35); see also Bayliss, 427 F.3d at
1218.  Second, Plaintiff's "significant erosion" argument is
misplaced.  A single occupation, if it has a significant number
of jobs available in the national economy, is sufficient.  See
Tamayo, 2013 WL 5651420, at *2.  She has not identified any
factor that should have eroded the table-worker job base.
Because 187,000 nationally available jobs is a significant number
of jobs, any error by the ALJ in failing to include a limitation
to one- or two-step tasks in Plaintiff's RFC was harmless.

          B.    The ALJ Properly Considered the Medical Evidence

          Plaintiff argues that the ALJ improperly rejected the
opinion of her treating psychiatrist, Dr. Padua, including that
she "lacked the ability to meet competitive standards of any kind
of work."  (J. Stip. at 24-27.)

                    1.    Applicable law

          Three types of physicians may offer opinions in Social
Security cases: (1) those who directly treated the plaintiff, (2)
those who examined but did not treat the plaintiff, and (3) those
who did neither.  Lester, 81 F.3d at 830.  A treating physician's
opinion is generally entitled to more weight than an examining
physician's, and an examining physician's opinion is generally
entitled to more weight than a nonexamining physician's.  Id.

          This is so because treating physicians are employed to cure
and have a greater opportunity to know and observe the claimant.
Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996).  If a
treating physician's opinion is well supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, it should be given controlling weight. § 416.927(c)(2). If a treating physician's opinion is not given controlling weight, its weight is determined by length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, amount of evidence supporting the opinion, consistency with the record as a whole, the doctor's area of specialization, and other factors. § 416.927(c)(2)-(6).

When a treating physician's opinion is not contradicted by other evidence in the record, it may be rejected only for "clear and convincing" reasons. See Carmickle, 533 F.3d at 1164 (citing Lester, 81 F.3d at 830-31). When it is contradicted, the ALJ must provide only "specific and legitimate reasons" for discounting it. Id. (citing Lester, 81 F.3d at 830-31). Furthermore, "[t]he ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); accord Batson, 359 F.3d at 1195.

> 2. Relevant background

Between 2011 and 2014, Plaintiff was evaluated and treated by Dr. Padua, a psychiatrist. (See AR 778, 1143.) On April 30, 2011, Dr. Padua completed an assessment form and assigned Plaintiff a "current" GAF score of 65. (AR 779.) In mental-status examinations performed between May 2011 and April 2012, Plaintiff presented as mostly normal. (See, e.g., AR 776 (May 28, 2011 mental-status examination normal), 775 (July 2, 2011

18

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, it should be given controlling weight. § 416.927(c)(2). If a treating physician's opinion is not given controlling weight, its weight is determined by length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, amount of evidence supporting the opinion, consistency with the record as a whole, the doctor's area of specialization, and other factors. § 416.927(c)(2)-(6).

When a treating physician's opinion is not contradicted by other evidence in the record, it may be rejected only for "clear and convincing" reasons. See Carmickle, 533 F.3d at 1164 (citing Lester, 81 F.3d at 830-31). When it is contradicted, the ALJ must provide only "specific and legitimate reasons" for discounting it. Id. (citing Lester, 81 F.3d at 830-31). Furthermore, "[t]he ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); accord Batson, 359 F.3d at 1195.

> 2. Relevant background

Between 2011 and 2014, Plaintiff was evaluated and treated by Dr. Padua, a psychiatrist. (See AR 778, 1143.) On April 30, 2011, Dr. Padua completed an assessment form and assigned Plaintiff a "current" GAF score of 65. (AR 779.) In mental-status examinations performed between May 2011 and April 2012, Plaintiff presented as mostly normal. (See, e.g., AR 776 (May 28, 2011 mental-status examination normal), 775 (July 2, 2011

mental-status examination noting Plaintiff had "fearful" but
"appropriate" appearance, "depressed" mood, and "labile" affect
but normal thought process, clear thought content, and unimpaired
orientation and judgment), 772 (July 16, 2011 mental-status
examination noting mild "constricted" affect but otherwise
normal), 771 (July 31, 2011 mental-status examination noting
"slightly" "constricted" affect but otherwise normal), 769 (Jan.
21, 2012 mental-status examination noting "obese" appearance and
"labile" mood but otherwise normal), 768 (Feb. 18, 2012 mental-
status examination noting "labile" mood and affect but otherwise
normal), 765 (Apr. 21, 2012 mental-status examination noting
"constricted" affect but otherwise normal).)

On March 3, 2012, Dr. Padua completed another psychiatric
assessment form.  (AR 777-78.)  He diagnosed bipolar disorder and
assigned Plaintiff a GAF score of 50,[8] noting that her "highest
GAF during the past year" was 65.  (AR 777.)  On June 2, 2012,
Dr. Padua completed a one-page preprinted "Narrative Report" form
that listed potential diagnostic criteria, symptoms, and other
information and had blank spaces for diagnoses, prescribed
medications, and comments.  (AR 938.)  Dr. Padua diagnosed
bipolar disorder.  (Id.)  In a section asking him to circle "all
criteria that apply" to Plaintiff, he noted that her thought
process was "ruminative," her memory and judgment were moderately
impaired, and she showed evidence of "confusion," "depression,"
"anxiety," "panic episodes," "manic syndrome," and "isolation."

---

[8] A GAF score of 41 to 50 indicates serious symptoms, such
as suicidal ideation, severe obsessional rituals, or frequent
shoplifting, or any serious impairment in social, occupational,
or school functioning.  See DSM-IV 34.

(Id.) Dr. Padua did not circle "insomnia," "phobias,"
"compulsive behavior," "suicidal/homicidal ideation," "decreased
energy," "isolation," or "inappropriate affect." (Id.) He
circled "fearful," "anxious," and "tearful" to describe
Plaintiff's attitude — but not "hostile" or "uncooperative" — and
"chronic" as her prognosis. (Id.) He noted that Plaintiff
needed assistance keeping her appointments. (Id.) Dr. Padua
assessed that Plaintiff could "interact appropriately" with
family but not with strangers, and he did not answer the question
as to coworkers or supervisors. (Id.) She was not able to
maintain a sustained level of concentration, perform repetitive
tasks for an extended period, or "adapt to new or stressful
situations." (Id.) She was able to manage her own funds. (Id.)
For the question, "Can [Plaintiff] complete [a] 40 hr. work week
without decompensating?" Dr. Padua circled, "no." (Id.) He left
the comment section blank. (Id.)

On July 14, 2012, Plaintiff reported to Dr. Padua that she
was "better now . . . just lonely, the anger is better, seroquel
is helping." (AR 1148.) In a mental-status examination, Dr.
Padua described Plaintiff as "alert, not in distress, not labile,
not hysterical," and he noted that she was obese and her thoughts
were "clear without rumination." (Id.) He noted that her
treatment was "effective" and medication efficacy was "stable."
(AR 1149.) On September 8, 2012, Plaintiff reported no changes
since her last visit, and Dr. Padua noted that she was "obese,
not in distress," her "mood [was] okay," and her "thoughts [were]
clear and linear." (AR 1150.) He again noted a good response to
medication. (AR 1151.) Plaintiff did not show up for a November

20

17, 2012 appointment.  (AR 1152.)

On January 2, 2013, Plaintiff was seen at Dr. Padua's clinic by another doctor.  (AR 1153.)  She "present[ed] urgently after [a] recent discharge from the hospital."  (Id.)  She had apparently been in the hospital "over Christmas" because of "psychosis in the context of non-compliance with medications." (Id.)  The doctor noted that Plaintiff had "struggled with non-compliance chronically and did miss her last appointment with Dr. Padua."  (Id.)  She was "symptomatically stable," did not "appear psychotic," and was "tolerating medication well."  (Id.)  Her judgment was impaired, but she otherwise presented appropriately. (AR 1153-54.)

Plaintiff followed up with Dr. Padua on January 26, 2013. (AR 1156-58.)  Her mental-status examination was normal, and Dr. Padua noted that she was alert, calm, in a "good mood," and had "clear and organized" thoughts.  (AR 1157-58.)  Plaintiff was "doing well" at a March 23, 2013 appointment with Dr. Padua, who noted that she was "asymptomatic" but complained of "being tired" and requested a decrease in her medication dosage.  (AR 1159.) Her mental-status examination revealed "normal" speech, "good" mood, "appropriate" affect, and "clear and organized" thought. (Id.)  Her medication adherence and response were "good."  (AR 1160.)

On April 28, 2013, Dr. Padua completed another preprinted "Narrative Report" form, identical to the one he filled out in June 2012.  (AR 1143.)  He again diagnosed bipolar disorder. (Id.)  For the section asking him to circle the "criteria that apply" to Plaintiff, he noted that Plaintiff's thought process

21

was "ruminative," her memory was severely impaired, her judgment was impaired, and she showed evidence of "confusion." Unlike the June 2012 report, Dr. Padua did not circle "depression," "anxiety," "panic episodes," "manic syndrome," or "isolation." (Id.) He did not circle "insomnia," "phobias," "compulsive behavior," "suicidal/homicidal ideation," "decreased energy," "isolation," or "inappropriate affect." (Id.) He circled "anxious" to describe Plaintiff's attitude — but not "fearful" or "tearful," which were both circled in June 2012, or "hostile" or "uncooperative" — and "chronic" as her prognosis. (Id.) He noted, as he did in 2012, that Plaintiff needed assistance keeping her appointments. (Id.) Dr. Padua assessed that Plaintiff could "interact appropriately" with family but not with strangers, coworkers, or supervisors. (Id.) As in 2012, she was not able to maintain a sustained level of concentration, perform repetitive tasks for an extended period, or "adapt to new or stressful situations." (Id.) She was still able to manage her own funds. (Id.) For the question, "Can [Plaintiff] complete [a] 40 hr. work week without decompensating?" Dr. Padua circled, "no." (Id.) Dr. Padua again left the comment section blank. (Id.) On May 18, 2013, Dr. Padua noted that Plaintiff was "doing well," was "asymptomatic," had "no complaints," and was "stable on medications." (AR 1234.) She presented as normal in a mental-status examination. (AR 1234-35.)

On July 27, 2013, Dr. Padua completed a "Mental Impairment Residual Functional Capacity Questionnaire." (AR 1183-88.) In it, he assigned Plaintiff a GAF score of 50 and noted that it was her highest one in the past year. (AR 1183.) Although the

written parts of the form are mostly illegible, in the check-box portions Dr. Padua checked "decreased energy," "thoughts of suicide," "blunt, flat or inappropriate affect," "impairment in impulse control," "mood disturbance," "psychomotor agitation or retardation," "marked distress due to recurrent and intrusive recollections of a traumatic experience," "persistent disturbances of mood or affect," "impulsive or damaging behavior," "disorientation to time and place," "perceptual or thinking disturbances," "hallucinations or delusions," "motor tension," "manic syndrome," "inflated self-esteem," "weight change," "pressures of speech," "memory impairment," and "sleep disturbance." (AR 1184.) He checked boxes to indicate that Plaintiff would be "unable to meet competitive standards" in every category of mental ability and aptitude needed to do unskilled, semiskilled, skilled, or "particular" work. (AR 1185-86.) For the question, "Does your patient have a low IQ or reduced intellectual functioning?" Dr. Padua checked, "no." (AR 1186.) He noted that Plaintiff had "marked" restrictions in daily living and difficulty maintaining social functioning, concentration, persistence, or pace. (AR 1187.) When asked how many episodes of decompensation of at least two weeks' duration Plaintiff had experienced within the year, he checked both "three" and "four or more." (Id.) He checked boxes to indicate that she had a "medically documented history of a chronic organic mental . . . or affective disorder . . . that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms and signs currently attenuated by medication or psychosocial thought," "a residual disease process

that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause" her to decompensate, and a "current history of 1 or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement." (Id.) Dr. Padua opined that Plaintiff's impairments would cause her to be absent from work more than four days each month. (AR 1188.)   In response to the question, "What is the earliest date that the description of symptoms and limitations in this questionnaire applies?" Dr. Padua indicated that they began on April 30, 2011. (Id.)

Between September 2013 and August 2014, Plaintiff's mental-status examinations were normal, and Dr. Padua noted that she was "doing well." (See AR 1236-37 (Sept. 21, 2013 office visit: Dr. Padua noting Plaintiff had "mild symptoms" but was "doing well overall," and she had "constricted" affect but otherwise normal mental-status examination), 1238-39 (Nov. 30, 2013 office visit: Dr. Padua noting Plaintiff was "doing well," "asymptomatic," "stable on medications," had "no complaints," with normal mental-status examination), 1239-40 (Jan. 25, 2014 office visit: same), 1240-41 (Apr. 5, 2014 office visit: same), 1252 (Aug. 16, 2014 office visit: same).)

### 3. Analysis

The ALJ found that Plaintiff was able to perform sedentary work with certain postural and exposure limitations and was limited to "simple tasks in a nonpublic work setting." (AR 26.) He considered Plaintiff's statements and Adult Function Report and concluded that they had "diminished" credibility. (AR 28-

24

30.)  He considered the Third Party Function Report completed by
Plaintiff's daughter and found it not credible to the extent it
was inconsistent with Plaintiff's RFC.  (AR 29.)[9]  He summarized
the medical opinions of the state-agency consultants,
consultative examiner, and treating physicians, including Dr.
Padua.  (AR 30-33.)  As to Plaintiff's alleged mental impairment,
he accorded "great weight" to the opinions of state-agency
doctors Hurwitz and Loomis and "some weight" to Dr. Rathana-
Nakintara's opinion.  (AR 32-33.)  He gave "little weight" to Dr.
Padua's opinion.  (AR 33.)  Because Dr. Padua's opinion that
Plaintiff would not be able to meet the competitive standards of
any kind of work was contradicted by other medical opinions in
the record, the ALJ had to give only specific and legitimate
reasons for rejecting all or part of it.  See Carmickle, 533 F.3d
at 1164.  As discussed below, the ALJ did so.

The ALJ gave "little weight" to Dr. Padua's opinion in part
because it was "brief, conclusory, and inadequately supported by
clinical findings."  (AR 33.)  Indeed, the opinions in Dr.
Padua's "Narrative Reports" and "Mental Impairment Residual
Functional Capacity Questionnaire" were all provided on
preprinted "check-box"-type forms.  (See AR 938, 1143, 1183-88.)
The "Narrative Report" opinions from June 2, 2012, and April 28,
2013, were rendered on one-page preprinted forms that listed
potential diagnostic criteria, symptoms, and other information
and provided blank spaces for diagnoses, prescribed medications,
and comments.  (See AR 938, 1143.)  Dr. Padua simply circled "no"

---

[9] Plaintiff has not challenged the ALJ's assessment of her
credibility or his rejection of the third-party report.

25

in response to the question, "Can [Plaintiff] complete [a] 40 hr. work week without decompensating?" (Id.) He did not provide any explanation for that finding or his finding that Plaintiff could not adapt to new or stressful situations, also in response to a preprinted form question. (See id.) The mental-impairment questionnaire was also a preprinted form, on which Dr. Padua checked boxes but provided little or no explanation for his findings. (See AR 1183-88.) The ALJ was entitled to discount the opinion on that basis. See Crane v. Shalala, 76 F.3d 251, 253 (9th Cir. 1996) (ALJ permissibly rejected psychological evaluations "because they were check-off reports that did not contain any explanation of the bases of their conclusions"); De Guzman v. Astrue, 343 F. App'x 201, 209 (9th Cir. 2009) (ALJ was "free to reject" doctor's check-off report that did not explain basis for conclusions); see also Batson, 359 F.3d at 1195 ("[A]n ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole . . . or by objective medical findings[.]").

Further, the ALJ found that Dr. Padua's opinion was "inconsistent with the objective medical evidence as a whole." (AR 33.) Indeed, there is no evidence in the rest of the medical record to support a finding that Plaintiff would be unable to meet the competitive standards of any kind of work. Dr. Padua's own treatment notes both before and after his reports reflect consistently normal mental-status examinations and a good response to medication. Mental-status examinations between May 2011 and April 2012 were all generally normal. (See AR 765-75.) In July and September 2012, Plaintiff showed a good response to

26

medication and was feeling "better." (See AR 1148, 1151.) She showed some regression on January 2, 2013, apparently because of noncompliance with her medication, but she was "symptomatically stable" and "tolerating medication well." (AR 1153.) By January 26 she was in a "good mood," and Dr. Padua noted normal responses to a mental-status examination. (AR 1156-58.) She had another normal mental-status examination in March 2013, and Dr. Padua again noted a good response to medication. (AR 1160.) Between September 2013, only a little more than a month after he completed the mental-impairment questionnaire indicating that Plaintiff was unable to meet competitive standards in every category of mental ability, and August 2014, Dr. Padua noted that Plaintiff was doing well, asymptomatic, and stable on her medications. (See AR 1236-41, 1252.) Her mental-status examinations during that time were all grossly normal. (See id.) The ALJ could permissibly reject Dr. Padua's more conservative opinions because they were inconsistent with his own treatment notes. See Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir. 2001); cf. Batson, 359 F.3d at 1195 (ALJ may discredit treating physicians' opinions that are "unsupported by the record as a whole").

Dr. Padua's opinions were also inconsistent with the other doctors'. Dr. Hurwitz opined that Plaintiff was "able to maintain concentration, persistence and pace throughout a normal workday/workweek as related to unskilled tasks" (AR 70) and was not significantly limited in her ability to complete a normal workday and week "without interruptions from psychologically based symptoms" (AR 76). Dr. Loomis agreed with Dr. Hurwitz's

opinion. (AR 87.) Dr. Rathana-Nakintara, who examined Plaintiff

and to whose opinion the ALJ gave "some weight," found that

Plaintiff had no limitations performing even detailed and complex

tasks (AR 1138) and "would be able to perform work activities on

a consistent basis without special or additional supervision" (AR

1138-39). Those opinions contradict Dr. Padua's opinion that

Plaintiff would be unable to meet the competitive standards of

any kind of work.[10]

Finally, the ALJ also rejected Dr. Padua's conclusion that

Plaintiff was unable to work because it was "an opinion on an

issue reserved to the Commissioner." (AR 33.) Indeed, Dr.

Padua's opinion that Plaintiff was unable to meet competitive

standards in every category of mental ability and aptitude (AR

1185-86) and was incapable of completing a 40-hour workweek

without decompensating (AR 938) was essentially an opinion on

Plaintiff's ultimate disability status, which the ALJ was not

obligated to accept. See § 416.927(d)(1) ("A statement by a

medical source that you are 'disabled' or 'unable to work' does

---

[10] Dr. Padua's opinion that Plaintiff had experienced three
or four (or more) episodes of decompensation of at least two
weeks' duration each between July 2012 and July 2013 (AR 1186) is
also not supported by the record. Dr. Padua's notes from July
2012 to November 2012 indicate no such episodes. (See AR 1148-
52.) She was in the hospital "over Christmas" in 2012 because of
a psychotic episode related to noncompliance with her medication
(AR 1153), but she had a normal mental-status examination in
January 2013 (AR 1157-58) and was "doing well" in March 2013,
with no mention of decompensation (AR 1159). Dr. Padua did not
record any episodes of decompensation in his April 2013 Narrative
Report (AR 1143), and in May 2013 Plaintiff was "doing well,"
"stable," and "asymptomatic" (AR 1234). If Plaintiff had
suffered any other two-week-long decompensation episode Dr. Padua
presumably would have mentioned it in his treatment notes.
Nowhere else in the record is any other period of decompensation
noted.

not mean that we will determine that you are disabled."); SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996) (treating-source opinions that person is disabled or unable to work "can never be entitled to controlling weight or given special significance"); see also McLeod v. Astrue, 640 F.3d 881, 885 (9th Cir. 2011) (as amended) ("A disability is an administrative determination of how an impairment, in relation to education, age, technological, economic, and social factors, affects ability to engage in gainful activity."). To the extent Dr. Padua meant that Plaintiff was disabled or unable to work, the ALJ properly discounted his opinion.

Because the ALJ provided specific and legitimate reasons for giving Dr. Padua's opinion limited weight, remand is not warranted on this basis.

C. Substantial Evidence Supported the ALJ's Determination that Plaintiff Could Perform at Least One Representative Job

Plaintiff argues that the ALJ improperly relied on the VE's testimony that she could perform the two identified jobs because the ALJ failed to include Plaintiff's "marginal education" in the hypothetical questions he posed to the VE (J. Stip. at 12-13) and because the identified jobs "require a high school education per the Occupational Outlook Handbook," which is inconsistent with her third-grade education (id. at 17-20). For the reasons discussed below, remand is not warranted on this basis.

1. Applicable law

At step five of the five-step process, the Commissioner has the burden to demonstrate that the claimant can perform some work

that exists in "significant numbers" in the national or regional economy, taking into account the claimant's RFC, age, education, and work experience. <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1100 (9th Cir. 1999); <u>see</u> 42 U.S.C. § 423(d)(2)(A); § 416.960(c). The Commissioner may satisfy that burden either through the testimony of a VE or by reference to the grids. <u>Tackett</u>, 180 F.3d at 1100-01.

To ascertain the requirements of occupations as generally performed in the national economy, the ALJ may rely on VE testimony or information from the DOT. SSR 00-4P, 2000 WL 1898704, at *2 (Dec. 4, 2000) (at steps four and five, SSA relies "primarily on the DOT (including its companion publication, the SCO) for information about the requirements of work in the national economy" and "may also use VEs . . . at these steps to resolve complex vocational issues"); SSR 82-61, 1982 WL 31387, at *2 (Jan. 1, 1982) ("The [DOT] descriptions can be relied upon — for jobs that are listed in the DOT — to define the job as it is <u>usually</u> performed in the national economy." (emphasis in original)). "Neither the DOT nor the VE . . . automatically 'trumps' when there is a conflict." SSR 00-4P, 2000 WL 1898704, at *2; <u>see also</u> <u>Johnson v. Shalala</u>, 60 F.3d 1428, 1435 (9th Cir. 1995) (noting that DOT "is not the sole source of admissible information concerning jobs" (alteration and citations omitted)).

When a VE provides evidence at step four or five about the requirements of a job, the ALJ has a responsibility to ask about "any possible conflict" between that evidence and the DOT. <u>See</u> SSR 00-4p, 2000 WL 1898704, at *4; <u>Massachi v. Astrue</u>, 486 F.3d 1149, 1152-54 (9th Cir. 2007) (holding that application of SSR

00-4p is mandatory). When such a conflict exists, the ALJ may accept VE testimony that contradicts the DOT only if the record contains "persuasive evidence to support the deviation." Pinto v. Massanari, 249 F.3d 840, 846 (9th Cir. 2001) (citing Johnson, 60 F.3d at 1435); see also Tommasetti, 533 F.3d at 1042 (9th Cir. 2008) (finding error when "ALJ did not identify what aspect of the VE's experience warranted deviation from the DOT"). An ALJ's failure to ask the VE about possible conflicts is harmless, however, when no such conflict actually exists. Massachi, 486 F.3d at 1154 n.19. When a hypothetical includes "all of the claimant's functional limitations, both physical and mental," an ALJ is generally entitled to rely upon the VE's response to it. Thomas, 278 F.3d at 956 (citation omitted); see also Bayliss, 427 F.3d at 1218 ("A VE's recognized expertise provides the necessary foundation for his or her testimony.").

Education is a vocational factor that should be considered at step five. See § 416.964(b). It is not a functional limitation. See § 416.960 (at step five, ALJ must consider RFC and separate "vocational factors" of age, education, and work experience). Thus, Thomas does not require that it be included in the hypothetical. Although relevant, "the numerical grade level that [a claimant] completed in school may not represent [the claimant's] actual educational abilities." § 416.964(b). "[I]f there is no other evidence to contradict it," however, the Commissioner should use a claimant's completed grade level to determine her educational ability. Id. There are four levels of education for Social Security purposes: illiteracy ("the inability to read or write"), marginal education ("ability in

31

reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs[,] . . . generally . . . formal schooling at a 6th grade level or less"), limited education ("ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs[,] . . . generally . . . 7th grade through the 11th grade"), and high school education and above ("abilities in reasoning, arithmetic, and language skills acquired through formal schooling at a 12th grade level or above"). <u>Id.</u>

            2.  <u>Relevant background</u>

    Plaintiff testified at the hearing without any assistance. (AR 42.)  The ALJ questioned Plaintiff as follows:

    Q:    And what is the highest grade that you completed in
          school?

    A:    Third grade.

    Q:    Was that here?

    A:    Yes.

    Q:    And do you have any difficulty reading or writing
          English?

    A:    Yes.

    Q:    Which one?

    A:    Writing.

(AR 45.)  Plaintiff testified that her last job was as a self-employed door-to-door salesperson.  (AR 46.)  She would "go to LA and buy purses and sell them, and make baby dolls and sell them," something she had been doing "since [she] was a teenager."  (<u>Id.</u>) The VE was present for all this testimony.  (AR 44.)

                              32

Later in the hearing, the ALJ asked the VE to assume a
44-year-old individual that can do at least sedentary
work, in that she could lift ten pounds frequently and
ten pounds or less, ten pounds or less frequently and
occasionally up to ten pounds without any difficulty.
She can stand and walk six hours, she can sit for six
hours. She can push and pull within those weight limits.
Occasional ramps and stairs. Occasional balance, stoop,
kneel, crouch and crawl. Should not be climbing ladders,
ropes or scaffolds. Should avoid concentrated exposure
to heat, and no unprotected machinery and/or heights.
Would be best with simple tasks in a non-pubic job.
(AR 58-59.) The ALJ asked if there would be any jobs at the
sedentary level given those limitations. (AR 59.) The VE
testified that such an individual could perform two sedentary,
unskilled "representative occupations" in the national economy:
"assembler," DOT 739.687-066, 1991 WL 680189, and "table worker,"
DOT 739.687-182, 1991 WL 680217. (AR 34-35.) The VE testified
that there were 222,000 assembler jobs and 187,000 table-worker
jobs available in the national economy. (Id.) When invited to
examine the VE, Plaintiff's counsel asked whether, "if an
individual were to be off task, let's say 15 percent of the day,"
any jobs would exist. (AR 60.) The ALJ noted that such an
individual "is not going to work in the national economy." (Id.)

In his September 2014 decision, the ALJ formulated an RFC
for a limited range of sedentary work that mirrored the first
hypothetical he posed to the VE. (AR 26.) Later in the opinion,
he determined that Plaintiff had a "marginal education" and was

"able to communicate in English," citing § 416.964.  (AR 34.)  He
summarized the VE's testimony, found that it was "consistent with
the information contained in the [DOT]," and relied on it to find
that Plaintiff could perform work in the national economy.  (AR
35.)  He therefore determined that Plaintiff was not disabled.
(Id.)

### 3.  Analysis

Plaintiff argues that the ALJ failed to include her
education level in the hypothetical he posed to the VE (J. Stip.
at 12-13) and, even assuming the VE did consider it, the jobs
identified by the VE were inconsistent with her third-grade
education (id. at 17-20).

This claim is waived in its entirety.  Plaintiff's attorney
cross-examined the VE at the administrative hearing but neglected
to question him about Plaintiff's education or any resulting
conflicts with the DOT or OOH.  (See AR 64-65); see Solorzano v.
Astrue, No. ED CV 11-369-PJW, 2012 WL 84527, at *6 (C.D. Cal.
Jan. 10, 2012) ("Counsel are not supposed to be potted plants at
administrative hearings. . . .  They have an obligation to take
an active role and to raise issues that may impact the ALJ's
decision while the hearing is proceeding so that they can be
addressed.").  He also did not raise the issue (or, indeed, any
of the issues raised in this Court) on appeal.  (See AR 296-97.)
Thus, the claim is waived.  See Meanel v. Apfel, 172 F.3d 1111,
1115 (9th Cir. 1999) (as amended) (reviewing court need not
address issues not raised before ALJ or Appeals Council);
Marchbanks v. Colvin, No. SA CV 13-1778-AS, 2014 WL 5756932, at
*1 (C.D. Cal. Nov. 4, 2014) (represented claimant's failure to

raise OOH-based claim at hearing or on administrative appeal

waives claim).[11]

Plaintiff has cited no binding authority for the proposition

that the ALJ must expressly mention a claimant's numerical

education level when propounding a hypothetical to a VE or that

the Court must review the OOH or any other publication to

determine whether substantial evidence supported reliance on the

VE's testimony.

While it is true, as Plaintiff notes, that "[h]ypothetical

questions posed to the vocational expert must set out <u>all</u> the

limitations and restrictions of the particular claimant," <u>Embrey</u>

<u>v. Bowen</u>, 849 F.2d 418, 422 (9th Cir. 1988), education is not a

"limitation" or "restriction" but rather a "vocational factor."

Moreover, "marginal education" is defined as possessing the

skills needed to do "simple, unskilled types of jobs."

§ 416.964(b). The ALJ included a limitation to "simple tasks" in

the hypothetical. (AR 26.) Thus it is not clear that the ALJ

erred by not expressly including Plaintiff's level of education

in the hypothetical. In any event, any error was harmless

because the VE was present when Plaintiff testified as to her

third-grade education and thus was aware of that factor.

Further, Plaintiff's educational level is clearly consistent with

the level-one reasoning required for the table-worker job.

And although the Commissioner's regulations provide that the

---

[11] <u>Sims v. Apfel</u>, 530 U.S. 103, 108 (2000), is not to the
contrary. It held only that claims raised before the ALJ but not
in the Appeals Council were not waived. <u>Id.</u> at 112. It
expressly declined to consider whether claims also not raised
before the ALJ were waived. <u>See id.</u> at 107.

OOH is one of several competent sources of job information, they do not say that it is the definitive source. See § 416.966(d). Plaintiff cites § 416.966(d)(1) for the proposition that the OOH "stands on the same footing as the DOT." (J. Stip. at 20.) But that section does not address whether a claimant can perform any particular work. Rather, § 416.966(d)(1) states that the Commissioner will take administrative notice of "job data," including the DOT and OOH, "[w]hen we determine that . . . jobs exist in the national economy in significant numbers either in the region where you live or in several regions of the country . . . ." Moreover, the Ninth Circuit has held that an ALJ may rely on a VE's testimony as a reliable source of information because a VE's "recognized expertise provides the necessary foundation for his or her testimony," and "no additional foundation is required." Bayliss, 427 F.3d at 1218. The ALJ was under no obligation to take notice of the OOH in making his determination, particularly when Plaintiff did not ask him to or even bring it to his attention.

Plaintiff argues that both occupations identified by the VE and the ALJ "require" a high school education. (J. Stip. at 19.) That is not so, however. Plaintiff equates the table-worker job with the OOH job of "Inspectors, Testers, Sorters, Samplers, and Weighers" and the compact-assembler job with the OOH job of "Production Workers, All Other." (Id. at 18-19.) Although the OOH descriptions for the jobs state that "[t]hese occupations usually require a high school diploma" or list a high school diploma as "typical," the descriptions allow for less education. See O*Net Online, Summary Report for Inspectors, Testers,

Sorters, Samplers, and Weighers, https://www.onetonline.org/link/
summary/51-9061.00 (last visited Apr. 12, 2017) (noting that 14
percent of respondents performing job had "less than high school
diploma"); Occupational Outlook Handbook, Data for Occupations
Not Covered in Detail, https://www.bls.gov/ooh/about/
data-for-occupations-not-covered-in-detail.htm (last visited Apr.
12, 2017) (listing "typical" education as high school diploma or
equivalent for "[p]roduction workers, all other").

Further, the DOT descriptions of the two identified jobs
support the ALJ's conclusion that Plaintiff could perform them.
Plaintiff's RFC limited her to simple tasks. (AR 26.) The ALJ
properly consulted the VE to determine whether any available jobs
would adequately accommodate Plaintiff's specific limitations.
See SSR 83-12, 1983 WL 31253, at *2 (noting that when
individual's exertional RFC does not coincide with any of defined
ranges of work but instead includes "considerably greater
restriction(s)," VE testimony can clarify extent of erosion of
occupational base); Moore v. Apfel, 216 F.3d 864, 870 (9th Cir.
2000); Thomas, 278 F.3d at 960.

A person performing the job of compact assembler, DOT
739.687-066, 1991 WL 680189,

> [j]oins upper and lower halves of vanity compacts:
> Inserts pins in hinges to join halves, using fingers or
> tweezers. Attaches spring catch lock by pressing it into
> place with pinching tool. Fits mirror on inside of
> cover.

Id. The job requires "level 2" reasoning, which is described as
the ability to "[a]pply commonsense understanding to carry out

detailed but uninvolved written or oral instructions" and "[d]eal with problems involving a few concrete variables in or from standardized situations." Id. It requires "level 1" math, which is the ability to "[a]dd and subtract two-digit numbers," "[m]ultiply and divide 10's and 100's by 2, 3, 4, 5," "[p]erform the four basic arithmetic operations with coins as part of a dollar," and "[p]erform operations with units such as cup, pint, and quart; inch, foot, and yard; and ounce and pound." Id. A person performing the job needs "level 1" language skills, described as the ability to "[r]ecognize meaning of 2,500 (two- or three-syllable) words," "[r]ead at rate of 95-120 words per minute," and "[c]ompare similarities and differences between words and between series of numbers." Id. For writing, the job requires the ability to "[p]rint simple sentences containing subject, verb, and object, and series of numbers, names, and addresses," and it requires the ability to "[s]peak simple sentences, using normal word order, and present and past tenses." Id. Level-one math and language skills are the lowest such levels required by the DOT. See DOT, app. C, 1991 WL 688702.

A person performing the table-worker job, DOT 739.687-182, 1991 WL 680217, "[e]xamines squares (tiles) of felt-based linoleum material passing along on conveyor and replaces missing and substandard tiles." Id. It requires the same level of math, language, writing, and speaking skill as the compact-assembler job. Id. It requires only "level 1" reasoning, however, which is the ability to "[a]pply commonsense understanding to carry out simple one- or two-step instructions" and "[d]eal with standardized situations with occasional or no variables in or

38

from these situations encountered on the job." <u>Id.</u> Again, these are all the lowest possible levels.

Nothing in those job descriptions appears to conflict with Plaintiff's RFC. Plaintiff was limited to simple tasks. (AR 26.) Indeed, the compact-assembler job, which requires putting smaller pieces together to create the larger whole, appears consistent with the ability to "make baby dolls," which she had been doing "[s]ince [she] was a teenager." (AR 46.) The table-worker job requires watching items on a conveyor belt and replacing the substandard ones.[12] The jobs appear to be consistent with an ability to perform only simple tasks.

Further, evidence in the record supports the ALJ's finding that Plaintiff could perform the representative jobs. Plaintiff demonstrated simple writing, reading, and speaking skills during the application process and hearing. When the ALJ asked her if she had any difficulty reading or writing, Plaintiff stated that she had trouble with writing only. (AR 45.) And although she claimed to have trouble writing, she was able to write in simple sentences, containing subject, verb, and object, in her Adult Function Report (<u>see</u> AR 249-56), which she personally filled out (<u>see</u> AR 256). At the hearing, she was able to speak in simple sentences, using normal word order and present and past tenses. (<u>See</u> AR 45-58.) In her Adult Function Report, she indicated that she was able to count change, use a checkbook, and shop in

---

[12] Plaintiff's RFC required that she "avoid unprotected machinery." (AR 26.) Although the table-worker job appears to involve machinery in the form of the conveyor belt, there is no indication as to whether it is "protected" machinery. In any case, Plaintiff did not raise this point.

1   stores.  (AR 252.)

2        Even if Plaintiff was limited to one- or two-step tasks, she

3   would be able to perform at least the table-worker job.  As

4   discussed in detail in Section V.A., the level-one reasoning

5   required for the table-worker job is consistent with a

6   restriction to simple tasks as well as a more conservative one-

7   or two-step limit.  Miessl, 403 F. Supp. 2d at 984-85.  Thus, any

8   error was harmless because Plaintiff was capable of performing

9   the reasoning requirements of the table-worker job, which has

10  187,000 jobs available nationally.  See Gutierrez, 740 F.3d at

11  528-29; Tommasetti, 533 F.3d at 1043-44; Stout, 454 F.3d at 1055;

12  Tamayo, 2013 WL 5651420, at *2.[13]

13       Substantial evidence supported the ALJ's finding that

14  Plaintiff could perform at least one of the jobs identified by

15  the VE.  The ALJ was entitled to rely on the VE's informed,

16  specific, and uncontradicted explanation that consistent with her

17  RFC for a limited range of sedentary work, Plaintiff was able to

18  work as a table worker.  See Bayliss, 427 F.3d at 1218.

19  Accordingly, remand is not warranted on this basis.

20

21

22

23

24       [13] Plaintiff argues that there was an unresolved conflict
    between the OOH, which allegedly states that the two identified
25  jobs "require" a high school education, and the VE's testimony,
    and that the ALJ erred in failing to inquire about it.  (J. Stip.
26  at 24.)  As an initial matter, no law of which the Court is aware
    requires an ALJ to inquire concerning possible conflicts with the
27  OOH.  In any event, any error was harmless because, as explained
    above, there was no actual conflict and the VE necessarily knew
28  of Plaintiff's educational level and nonetheless found that she
    was capable of performing the table-worker job.

**VI.  CONCLUSION**

Consistent with the foregoing and under sentence four of 42 U.S.C. § 405(g),[14] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner, DENYING Plaintiff's request for remand, and DISMISSING this action with prejudice.


DATED: April 30, 2017

_Jean Rosenbluth_

JEAN ROSENBLUTH
U.S. Magistrate Judge

---

[14] That sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

41